UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                              | )                              |
|------------------------------|--------------------------------|
| **ARTASH K. HOVSEPYAN,**     | )                              |
|                              | )                              |
| **Plaintiff,**               | )                              |
|                              | )                              |
| v.                           | ) Civ. Action No. 10-868 (RMC) |
|                              | )                              |
| **JOAQUIN F. BLAYA,** *et al.,* | )                           |
|                              | )                              |
| **Defendants.**              | )                              |
|                              | )                              |

**MEMORANDUM OPINION**

In this employment discrimination action brought *pro se*, Artash K. Hovsepyan brought suit against his former employer, Voice of America ("VOA"), a division of the Broadcasting Board of Governors (the "Board"). Mr. Hovsepyan alleges that VOA discriminated against him on the bases of his age (57) and disability resulting from a "massive heart attack."[1] Compl. at 5. He also claims that his firing on June 27, 2007, was in retaliation for his equal employment opportunity ("EEO") and whistleblowing activities. *See id.* at 13. The Board[2] moves to dismiss the complaint or for summary judgment. *See* Mot. to Dismiss or for Summ. J. ("Def.'s Mot.") [Dkt. # 14]. Mr.

---

[1] The Broadcasting Board of Governors is an independent federal agency. *See* www.bbg.gov.; *Am. Fed'n of Gov't Emp. v. Broad. Bd. of Governors*, 711 F. Supp. 2d. 139, 142-43 (D.D.C. 2010).

[2] In addition to the former Board Chairman, Joaquin F. Blaya, Mr. Hovsepyan also names as defendants D. Jeffrey Hirschberg, Steven J. Simmons, Blanquita Walsh Cullum, and Hillary Rodham Clinton, in their official capacities as members of the Board. *See* Compl., caption. The proper defendant is the "head of the department, agency, or unit." *Honeycutt v. Long*, 861 F.2d 1346, 1349 (5th Cir. 1988). The Rehabilitation Act, 29 U.S.C. 794a(a)(1), adopts Title VII procedures, and Title VII, 42 U.S.C. § 2000e-16(c), expressly provides that the only proper federal defendant is the "head" of the "agency" involved. *Id.* Also, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, is construed consistently with Title VII. *Id.*; *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 (1979). Thus, the proper defendants here are Victor Ashe and Dennis Malhaupt, the current Co-Chairmen of the Board's Governance Committee. Pursuant to Federal Rule of Civil Procedure 25(d)(1), they are substituted for the Defendants in this case. The Defendants will be referred hereafter in the singular as either the Board or VOA.

Hovsepyan has moved three times for summary judgment or for a jury trial [Dkt. ## 19, 30, 33] and twice for the appointment of counsel [Dkt. ## 3, 32]. Upon consideration of the parties' submissions and the entire voluminous record, the Court will grant in part and deny in part the Board's dispositive motion, deny Mr. Hovsepyan's motions for summary judgment, and grant his motion to appoint counsel. All claims will be dismissed except the retaliation claim.

## I. BACKGROUND

The facts relevant to the identifiable claims of the complaint, which the Court has liberally construed, are as follows. Mr. Hovsepyan worked for VOA's Armenian Service from May 30, 1993, to June 29, 2007. At the time of his firing at age 57, Mr. Hovsepyan was a GS-12 International Broadcaster in VOA's Near East and Central Asia Division, Armenian Service.

### A. Disability Discrimination Claim

In November 2003, Mr. Hovsepyan suffered a heart attack. He worked from home and returned to work full time in May 2004. Def.'s Statement of Material Facts Not in Dispute ("Def.'s Facts") [Dkt. # 14] ¶ 7. According to Mr. Hovsepyan, he suffered a "massive" heart attack and "gradually started back to full time duty since [sic] February 2005." Pl.'s Replies to "Defendant's Statements of Material Facts Not in Dispute" ("Pl.'s Facts") [Dkt. # 20-1] at 4. On April 26, 2005, Mr. Hovsepyan's supervisor, Armenian Service Chief Araxie Vann, asked him to provide an update of his health status, and on August 24, 2006, she asked him "for additional medical documentation . . . to determine if [he] still needed accommodation to work in a light duty status." Def.'s Facts ¶¶ 8-9. Mr. Hovsepyan allegedly "replied that he no longer considered himself working in light duty status since May 4, 2004 and that he required no accommodation." *Id*. ¶ 9. According to Mr. Hovsepyan, he "had never 'complained on physical aspect of his job' . . . never

2

told Ms. Vann that his job was 'challenging at times due to his medical condition' . . . [and never] asked Ms. Vann 'for an accommodation' since the end of December 2003 after his Massive heart attack." Pl.'s Facts at 5.

### B. Age Discrimination Claim

In early September 2004, VOA allegedly stopped "training [Mr. Hovsepyan] to become a host for the Armenian Air shows" while continuing to train a contractor sixteen years younger than he and "gave the same opportunity to another contractor . . . who was almost twelve . . . years younger" than he. Compl. at 5.

### C. Retaliation Claim

#### 1. *Mr. Hovsepyan's Alleged Whistleblower Activity*

On January 14, 2005, Mr. Hovsepyan attended a staff meeting of the Armenian Service. According to VOA, Mr. Hovsepyan "complained about the quality of the work being done by the Armenian Service." Def.'s Facts ¶ 4. According to Mr. Hovsepyan, "Armenian Service members discussed in details the ways to improve the quality of work . . . ," he "made a suggestion to conduct live shows and added, that he was ready to conduct it," and that "[t]he meeting was calm." Pl.'s Facts at 2. Mr. Hovsepyan then attended another meeting in the office of the Chief of the Near East and Central Asia Division, where he, Ms. Vann, and Division Chief Ismail Dahiyat discussed the quality of the Service's work. Def.'s Facts ¶ 5. Mr. Hovsepyan seems to agree that the meeting took place, but he "strongly disagrees" that he "and his wife, Ms. Abajyan[,] were called to Mr. Dahiyat's office on January 14, 2005 to 'discuss quality of the Armenian Service's work.'" Pl.'s Facts at 3. Mr. Hovsepyan states that during the meeting, in response to Ms. Vann's "request to express his opinion on the work the Armenian Service was performing, [he stated] that the quality

3

of work at the Service was not good, and actually [] had gone down because 'we are making all kinds of mistakes.' " Pl.'s Mot. Against Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss, or in the Alternative, for Summ. J. ("Pl.'s Opp'n Mem.") [Dkt. # 20] at 13.

On April 25, 2005, Mr. Hovsepyan, Ms. Vann, and Mr. Dahiyat attended a meeting of the Armenian Service that was also attended by independent contractor Lusine Kalasyan and, according to Mr. Hovsepyan, two other contractors, Ms. Abajyan and Vahagn Babayan. Def.'s Facts ¶ 6; Pl.'s Facts at 3. During the meeting, Mr. Hovsepyan accused the Service of misusing funds and stated "that the work product of Ms[es]. Vann . . . Kalashyan and [] Babayan [] was of unacceptable quality." Def.'s Facts ¶ 6. Mr. Hovsepyan asserts that Mr. Dahiyat "organized" the meeting "to pursue [sic] the Plaintiff not to complain on Ms. Vann's wrongdoings further, as several days before, on April 22, 2005[,] Plaintiff had taken his grievances on Ms. Vann's wrongdoings to Armenian Program Review" attended by "many high ranking Agency officials." Pl.'s Facts at 3.

2. *Mr. Hovsepyan's Job Performance and Termination*

In May 2004, the Armenian Service changed its broadcasting format to television only, and Mr. Hovsepyan was given a new position as a television broadcaster. Def.'s Facts ¶¶ 10, 12. VOA later provided Mr. Hovsepyan with a description of his new duties and performance standards, which he acknowledged on May 19, 2005. *Id*. ¶¶ 12-14. Mr. Hovsepyan states that he "was given a new position description from September 2004 to April 2005 which was (TV) translation, and he was performing according to his new position description." Pl.'s Facts at 6, ¶ 12. He agrees that he was notified about new performance standards for the position of television broadcaster in May 2005. *Id*. ¶¶ 13, 14.

Mr. Hovsepyan received a letter of admonishment from Ms. Vann on September 14,

2005, "for inappropriate and disruptive behavior," based on their encounters on July 6 and July 11, 2005, and two incidents on July 25, 2005. Def.'s Mot., Ex. 38 [Dkt. # 14-29]. Ms. Vann wrote that on July 6, after having completed an assigned translation of approximately seven minutes of program material, Mr. Hovsepyan "threw it on [her] desk and said 'You are loading me like a donkey. You shouldn't be allowed to do that.'" On July 11, Mr. Hovsepyan "argued with [her] during a staff meeting about why [his] wife is no longer editing . . . and . . . 'why her job was taken away from her' or words to that effect." On July 25, Mr. Hovsepyan "interrupted a staffer and criticized their [sic] input during a staff [planning] meeting" and "argued" with Ms. Vann about a translation assignment. *Id*. at 1. Mr. Hovsepyan states that "the 'facts' [in the admonishment letter] were based on lies . . . in the height of Plaintiff's complaints to the Agency's officials and to OIG on Ms. Vann's wrongdoings at the Armenian Service." Pl.'s Facts at 7, ¶ 15.

Mr. Hovsepyan received a letter of reprimand from Ms. Vann on February 3, 2006, for "disrespectful behavior" toward her as his supervisor and toward Ms. Kalashyan as his colleague. Def.'s Mot., Ex. 39 [Dkt. # 14-30]. Ms. Vann reprimanded Mr. Hovsepyan for, among other actions, having "berated [her] in a loud voice" in front of staff attending a staff meeting on January 10, 2006, when she asked him about his availability to cover a conference, *id*. at 1, "belittled [her] ideas," *id*. at 2, and failed to follow her instructions sent by e-mail on January 23, 2006, to "put together a TV package," not a roundtable interview. *Id*. at 3. In addition, Ms. Vann reprimanded Mr. Hovsepyan for acting bored at a staff meeting on February 2, 2006, and interrupting Ms. Kalashyan during her presentation of stories on which she was working "by getting up, and stating [that he] had urgent work to finish" and eventually leaving the meeting, which was "not the first time [he] had left a staff meeting when [Ms. Kalashyan] started speaking." *Id*. Mr. Hovsepyan's "reply [to the reprimand]

5

is the same" as his reply to the admonishment, Pl.'s Facts at 7, ¶ 16 — implying that the reprimand, like the admonishment, was done in retaliation for his complaints to agency officials and the OIG regarding Ms. Vann.

On July 26, 2006, Ms. Vann issued her performance appraisal of Mr. Hovsepyan for the period covering May 1, 2005 to April 30, 2006. Def.'s Mot., Ex. 2 [Dkt. # 14-3]. She rated him unacceptable in one of six critical elements and criticized him specifically for his "inability to roll an interview into a TV feature story." *Id*. at 9. As a result, Ms. Vann issued to Mr. Hovsepyan that same day a "Notice of Unacceptable Performance," which detailed his deficiencies in satisfying "Performance Requirement 2" and informed him that he had 30 days to improve.[3] *Id*. She required him "to produce one usable TV script for every 40 hours [he was] present at work" that satisfied quality and timeliness standards explained in the notice, and "to come up with ideas for original reporting." *Id*. at 5 (page numbers supplied). Mr. Hovsepyan "strongly disagrees that Defendant was honest to demand one interview/coverage per week [between] May 2005 and January 2006" when allegedly "Ms. Vann had not sent [him] to take the remaining two courses of Video editing till the end of November 2005 [but yet] retroactively demanded from [him] Video editing, and Video shooting skills from May 1, 2005 till April 2006." Pl.'s Facts at 8, ¶ 18. Mr. Hovsepyan also alleges that "during[] or after" the 30-day Performance Improvement Plan ("PIP"), no one spoke with him about his performance or told him "when the PIP [would] end . . . [and] if he was required to make one interview per week during his alleged PIP period or afterwards . . . ", and he asserts that such

---

[3] Performance Requirement 2 involved "writ[ing] feature stories on a variety of subjects for television[,] [using] a variety of sources . . . [and preparing] integrated, highly-targeted, well balanced television program segments." Def.'s Mot., Ex. 3 [Dkt. # 14-4]. For acceptable performance, Mr. Hovsepyan was required to produce at least one original television feature story weekly. *Id*.

discussions were required by "Labor law." *Id*. at 9, ¶ 20.

On March 13, 2007, Division Chief Dahiyat issued a proposed notice of removal for Mr. Hovsepyan, based on his inability "to maintain an acceptable level of performance in Performance Requirement 2." Def.'s Facts ¶ 23; Pl.'s Facts at 12.[4] VOA Director Danforth W. Austin issued a notice of removal on June 27, 2007, finding "that the evidence fully supports the conclusion that your performance is at the unacceptable level in Performance Requirement 2 concerning the production of original TV feature stories." Def.'s Additional Exhibits, Ex. 6 [Dkt. # 16-1] at 1. Mr. Austin considered the agency's documentation and Mr. Hovsepyan's written and oral replies to the proposed notice of removal submitted with the assistance of counsel, and "weighed the credibility of those involved . . . " in the events leading up to the proposed removal. *Id*. at 1.

Because the proposed removal notice purportedly did not address all aspects of Mr. Hovsepyan's performance, the decision to remove him turned on the "quantity of [his] work" during and after the 30-day PIP, from August 26, 2006 to March 12, 2007. *Id*. at 2, 3. The Board determined that during that period, Mr. Hovsepyan had averaged one script every 48 hours of work, which was "unacceptable in Performance Requirement 2." *Id*. at 3. Mr. Hovsepyan questions Ms. Vann's competence to evaluate his writing skills, *see* Pl.'s Facts at 9, ¶ 21, and states that "[i]t is weird" that his PIP allegedly was based on his writing deficiencies, "and haphazardly []mentioned [his] quantity deficiencies," while his termination was based on his "quantity issues." *Id*. at 11, ¶ 23. He also states that the "Agency's Decision was based on lies [and] double standards . . . ." *Id*. at 12, ¶ 24.

---

[4] Neither party has placed the proposed notice of removal in the record.

## II. LEGAL STANDARDS

### A. Rule 12(b)(1)

In ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court "may consider the complaint [standing alone or] where necessary . . . supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *See Herbert v. Nat'l Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing cases). The plaintiff bears the burden of showing by a preponderance of the evidence that the court has jurisdiction to entertain a claim. *See Nurse v. Sec'y of Air Force*, 231 F. Supp. 2d 323, 326 (D.D.C. 2002) (citing cases).

### B. Rule 56

Summary judgment is appropriate "if the movant shows [through facts supported in the record] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This procedural device is not a "disfavored legal shortcut" but a reasoned and careful way to resolve cases fairly and expeditiously. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case, *i.e.*, that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

In employment discrimination cases under Title VII — in the absence of direct evidence of discrimination — courts generally apply the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff is successful, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its conduct. "If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993).

Once an employer articulates a legitimate, non-discriminatory reason, "the prima-facie-case aspect of *McDonnell Douglas* [becomes] irrelevant." *Adeyemi v D.C.*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). Then, "the district court must conduct one central inquiry in considering an employer's motion for summary judgment . . . [*i.e.*,] whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Id*. (citation omitted). To " 'survive summary judgment[,] the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.' " *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)) (other citation omitted). "All relevant evidence" includes, *inter alia*, evidence of the plaintiff's prima facie case and evidence proving the employer's proffered reasons to be false, *see Aka v. Wash. Hosp. Ctr.*,

9

156 F.3d 1284, 1289 (D.C. Cir. 1998), as well as the evidence presented by the defendant. *See Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *Adeyemi*, 525 F.3d at 1227. "[B]are allegations of discrimination are insufficient to defeat a properly supported motion for summary judgment." *Burke v. Gould*, 286 F.3d 513, 521 (D.C. Cir. 2002).

### III. ANALYSIS

#### A. Subject Matter Jurisdiction

The Board asserts that the Court lacks jurisdiction over Mr. Hovsepyan's claim purportedly brought under the Whistleblower Protection Act ("WPA") of 1989, 5 U.S.C. § 2302, because the Merit Systems Protection Board ("MSPB") previously decided the claim against him, *see* Def.'s Additional Exhibits, Ex. 30 [Dkt. # 16-10] (Initial Decision of the MSPB), and the United States Court of Appeals for the Federal Circuit has exclusive jurisdiction over appeals from the MSPB. Mr. Hovsepyan responds that after "having an extremely unpleasant experience with MSPB's 'Justice', [he] did not try to appeal to MSP Board or the Federal Circuit to seek corrective action of MSPB AJ's absurd decision on [his] case . . . ." Pl.'s Opp'n Mem. at 76.

Mr. Hovsepyan does not claim – and the record does not show -- that the WPA claim at the administrative level presented "a 'mixed case', *i.e.*, an adverse personnel action subject to direct appeal to the MSPB coupled with a discrimination claim." *Dews-Miller v. Clinton*, 707 F. Supp. 2d 28, 44 (D.D.C. 2010). Therefore, he was required to proceed under the Civil Service Reform Act ("CSRA"), 5 U.S.C. §§ 1101 *et seq.*, which provides the exclusive remedy for adjudicating certain personnel issues arising from federal employment.[5] The CSRA "regime

---

[5] As summarized by the Administrative Judge, Mr. Hovsepyan's administrative complaint filed with the Office of Special Counsel on July 23, 2009, "alleged, *inter alia*, that the September 14, 2005 letter of admonishment, the February 3, 2006 letter of reprimand, the July 26, 2006 Notice

provides for adjudication of all [personnel] claims by [the Office of Personnel Management ("OPM")], 5 U.S.C. § 8347(b), appeal of adverse decisions by OPM to the MSPB, *id*. § 8347(d)(1), and subsequent review of MSPB decisions in the Federal Circuit, *id*. § 7703 (b)(1); 28 U.S.C. § 1295(a)(9)." *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005). The Court concludes that it lacks jurisdiction over Mr. Hovsepyan's WPA claim and, thus, will grant the Board's motion to dismiss the claim under Rule 12(b)(1). *See id*. (observing that "[a] series of opinions from the Supreme Court and this court make clear that these remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA.").

### B. Disability Discrimination Claim

The Board argues that Mr. Hovsepyan has failed to state a claim of disability discrimination. "The Rehabilitation Act of 1973 governs employee claims of handicap discrimination against the Federal Government. Its basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993); *see* 29 U.S.C. § 791(b) (requiring federal employers to take "affirmative action" when making "hiring, placement, and advancement" decisions regarding "individuals with disabilities"). "The exclusive remedy for federal employees alleging that federal agencies engaged in disability discrimination is Section 501 of the Rehabilitation Act, codified at 29 U.S.C. § 791." *Rand v. Geithner*, 609 F. Supp. 2d 97, 100 (D.D.C. 2009) (citing *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003)); *accord Sataki v.*

---

of Unacceptable Performance" and the proposed removal for unacceptable performance and removal on June 27, 2007, "were all taken in retaliation for his alleged whistleblowing activities." Def.'s Additional Exhibits, Ex. 30 [Dkt. # 16-10] at 2.

11

*Broad. Bd. of Governors*, 733 F. Supp. 2d 1, 13 (D.D.C. 2010). The Rehabilitation Act prohibits disability discrimination by incorporating Section 102 of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12112. *See* 29 U.S.C. § 791(g); *Woodruff v. Peters*, 482 F.3d 521, 527-28 (D.C. Cir. 2007).

To state a disability discrimination claim under the Rehabilitation Act, Mr. Hovsepyan must establish that (1) he was disabled within the meaning of 29 C.F.R. § 1630.2(g); (2) he was otherwise qualified to perform the essential functions of his job; and (3) his employer was aware of his disability, but either refused to accommodate him or terminated him because of the disability. *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994); *Chinchillo v. Powell*, 236 F. Supp. 2d 18, 23 (D.D.C. 2003) (citing cases). A violation of the Rehabilitation Act occurs only when the employer "acted with an awareness of the disability itself and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability." *Crandall v. Paralyzed Veterans of America*, 146 F.3d 894, 897 (D.C. Cir. 1998). Thus, "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings. v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).

By his own admissions in opposing the pending dispositive motion, Mr. Hovsepyan "had never 'complained on physical aspect of his job' . . . never told Ms. Vann that his job was 'challenging at times due to his medical condition' . . . [and never] asked Ms. Vann 'for an accommodation' since the end of December 2003 after his Massive heart attack." Pl.'s Facts at 5. Given that there is no genuine dispute over a fact material to the Rehabilitation Act claim, the Court concludes that the Board is entitled to judgment as a matter of law on this claim.

### C. Age Discrimination Claim

To state a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, Mr. Hovsepyan must allege that he belonged to the protected age group of 40 years and older and that he suffered an adverse employment action because of his age. As a federal employee, Mr. Hovsepyan "can establish liability under § 633a in one of two ways. First, [he] can make use of the *McDonnell Douglas* evidentiary framework to establish that age was the but-for cause of the challenged personnel action . . . . Second, [he can show] that age was a factor in the challenged personnel action." *Ford v. Mabus*, 629 F.3d 198, 207 (D.C. Cir. 2010).

It is undisputed that Mr. Hovsepyan was 57 and that he was terminated. In support of his age discrimination claim, Mr. Hovsepyan alleges that in September 2004, his "training to became [sic] a host for the Armenian TV program" was stopped, "but training was continued with [sic] Contractors Ms. Kalashyan and Mr. Babayan who were younger [than him] for [sic] almost 16 and 12 years." Pl.'s Opp'n at 11. He also alleges that in January 2005, Ms. Vann sent "her confidante Contactor [sic] Ms. Kalasyan to Video Journalistic training" four months before she sent him to the same training, *id*. at 12, and that "Ms. Kalashyan was sent to cover President Bush's Inauguration in January, 2005, [while] Full Time Employee Plaintiff, who had 12 years of impeccable work history, was ignored." *Id*.

Mr. Hovsepyan does not connect the foregoing events to his termination. Even if he had, the Court finds that no reasonable jury examining the relevant evidence could find age to have been a motivating factor for the otherwise legitimate, non-discriminatory reasons for placing Mr. Hovsepyan on a PIP and eventually firing him. *See Kelly v. Mills*, 677 F. Supp. 2d 206, 222 (D.D.C. 2010) ("The PIP placement itself had no effect on the terms or conditions of . . . employment and

thus was not 'materially adverse' because it did not cause a 'significant change in employment status.' ") (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)) (other citations omitted). In the Notice of Unacceptable Performance dated July 26, 2006 ("Notice"), Ms. Vann informed Mr. Hovsepyan that his performance was unacceptable in the area of writing feature stories, which involved the following:

> Performance Requirement 2: Writes feature stories on a variety of subjects for television. Uses a variety of sources including area experts, video library archives, daily newspapers, or magazines. Prepares integrated, highly-targeted, well balanced television program segments.
>
> Performance standard for Acceptable performance: On weekly basis, produces one original TV feature story that captures the attention of the audience. Meets the standards for accuracy, TV style and presentation. Shows initiative by taking on any event coverage responsibilities and research related to it.

Def.'s Mot., Ex. 3 [Dkt. # 14-4] at 2. Ms. Vann informed Mr. Hovsepyan that "[d]uring the first half of the 2005-2006 rating period[,] you made almost no effort to meet the performance standards mentioned above[,]" and when "[a]fter the mid-year review you began writing and video editing original scripts[,] . . . the quality of your work was so poor that each piece required significant editing and rewriting before it could be used." *Id*. Ms. Vann listed 15 scripts Mr. Hovsepyan had prepared between January 13 and June 8 of 2006, and in her critique of each one explained the deficiencies. *Id*. at 2-4. In sum, Ms. Vann faulted Mr. Hovsepyan for failing to present balanced stories and original story ideas, and for researching topics inadequately and presenting assigned stories that exceeded the allotted time. Ms. Vann informed Mr. Hovsepyan that during the 30-day PIP, he would be required "to produce one usable TV script for every 40 hours you are present at work." *Id*. at 5. She defined "usable" as a script "that meets the quality standard and timeliness

standard," the measurements of which were also explained. *Id*. at 5-6. Ms. Vann listed several ways for Mr. Hovsepyan to improve his performance, further informed him that his failure to perform at the acceptable level could result in reassignment, reduction in grade or removal, and offered her assistance. *Id*. at 6-7. The Board based its decision to remove Mr. Hovsepyan on his averaging one script every 48 hours of work between August 26, 2006 and March 12, 2007. Def.'s Additional Exhibits, Ex. 6 [Dkt. # 16-1] at 3.

Mr. Hovsepyan "strongly disagrees that Defendant was honest to demand one interview/coverage per week [between] May 2005 and January 2006" when allegedly "Ms. Vann had not sent [him] to take the remaining two courses of Video editing till the end of November 2005 [but yet] retroactively demanded from [him] Video editing, and Video shooting skills from May 1, 2005 till April 2006." Pl.'s Facts at 8, ¶ 18. However, the scripts Ms. Vann relied upon in issuing the PIP began on January 13, 2006, and Mr. Hovsepyan does not dispute Ms. Vann's observation that his problems persisted "in spite of the fact that [he had] taken numerous training classes in the past two years to assist [him] in performing [his] TV duties." Notice at 5 (listing five classes Mr. Hovsepyan had taken between Summer 2004 and November 2005 covering television writing, producing and editing). Furthermore, the termination decision was based on Mr. Hovsepyan's performance from August 2006 to March 2007 -- months after the period during which he suggests he was ill-equipped to satisfy the performance standard.

Mr. Hovsepyan also alleges that "during[] or after" the 30-day PIP, no one spoke with him about, *inter alia*, "his current performance in Performance Element 2, that it did not meet the Acceptable standards, . . . when the PIP [would] end, . . . [and] if he was required to make one interview per week during his alleged PIP period or afterwards . . . ." Pl.'s Facts at 9, ¶ 20. But the

15

Notice informed him that "[d]uring the next 30 days you must improve your performance to the Acceptable level as established in the Performance Requirements and Standards . . . in terms of quantity and quality . . . .," the measurements of which were also stated in detail.[6] Notice at 5. Having issued the termination notice on July 27, 2007, the Board had given Mr. Hovsepyan nearly a year to improve.

Mr. Hovsepyan's bald accusations of lying, *see, e.g.*, Pl.'s Opp'n Mem. at 5-6, suggestion that the performance standards were not reasonably attainable, and conclusion that Ms. Vann was not competent to supervise him, fail to demonstrate that his age had anything to do with his discharge. Simply stated, he has proffered nothing to advance his ADEA claim beyond the summary judgment stage. "[C]ourts are without authority to 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.' " *Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (quoting *Fischbach v. District of Columbia Dep't of Corr.,* 86 F.3d 1180, 1182 (D.C. Cir. 1996)) (other citation omitted); *see Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) ("We have consistently declined to serve as a 'super-personnel department that reexamines an entity's business decisions.' ") (citation omitted). Furthermore, a "plaintiff's mere speculations are 'insufficient to create a genuine issue of fact regarding [a decision maker's] articulated reasons for [its decisions] and avoid summary judgment.'" *Brown v. Brody*, 199 F.3d 446, 459 (D.C. Cir. 1999) (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)) (brackets in original) (language altered); *see Slovinec v. American University*, 520 F. Supp. 2d 107

---

[6] In the Decision of Removal, Mr. Austin found Mr. Hovsepyan's claims regarding the failure to communicate were "directly contradicted by the record emails and other documents" that show that "Ms. Vann was a very engaged supervisor[,] [having] met with [Mr. Hovsepyan] every day and sent dozens of emails providing [him with] assistance, guidance[,] and instruction in performing [his] work." Def.'s 6 at 7 (listing 17 emails as "examples").

(D.D.C. 2007) (rejecting "Plaintiff's conclusory, self-serving statements pertaining to Defendant's 'phony' explanation offer").

When presented with the foregoing evidence, no reasonable jury could disagree with Mr. Austin's determination that Mr. Hovsepyan was "given a reasonable opportunity to demonstrate sustained acceptable performance [on Performance Requirement 2] but failed to do so," Def.'s Additional Exhibits, Ex. 6 [Dkt. 16-1] at 1, nor could it find from the evidence that Mr. Austin's reasoning was pretextual and that he really fired Mr. Hovsepyan because of his age. The Court therefore finds that the Board is entitled to summary judgment on the ADEA claim.

### D. Retaliation Claim

Mr. Hovsepyan alleges that his firing was in retaliation for his EEO and whistleblower activity. The Rehabilitation Act prohibits retaliation by incorporating the relevant provisions of the ADA. *See* 29 U.S.C. § 791(g); *Woodruff*, 482 F.3d at 437-38. The ADA's anti-retaliation provision applicable to Rehabilitation Act claims forbids "discrimina[tion] against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). The D.C. Circuit has held that the framework for analyzing anti-retaliation suits under the Rehabilitation Act mirrors that applied for retaliation suits under Title VII of the Civil Rights Act. *See Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) ("Although the [retaliation] framework was developed for Title VII cases, our sister circuits have all accepted its application to ADA retaliation suits under 12203(a), as we do now.") (citing cases); *Shipman*, 692 F. Supp. 2d at 119 (finding same for claims under the ADEA). Unlike the limitations of Title VII's anti-discrimination provision to discriminatory acts affecting the terms and conditions of employment, the anti-retaliation provision is construed broadly "to cover a broad range of employer conduct."

*Thompson v. North Amer. Stainless*, LP, 131 S.Ct. 863, 868 (2011). To survive the Board's motion on the retaliation claim, then, Mr. Hovsepyan must show through proffered evidence that a reasonable jury could find that "'a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

The Board acknowledges that Mr. Hovsepyan engaged in EEO activity when, on June 17, 2005, he was a witness in an EEO investigation of a contract employee's EEO complaint. *See* Def.'s Mot. [Dkt. # 14] at 15 (citing Def.'s Additional Exhibits, Ex. 21 [Dkt. # 16-7] at 046). It argues for dismissal of the retaliation claim on the basis that Mr. Hovsepyan cannot establish a causal connection between the protected activity in 2005 and his firing in 2007. *Id*. In his opposition papers, however, Mr. Hovsepyan identifies other alleged EEO activity leading up to his termination that the Board has not considered. *See* Pl.'s Opp'n Mem. at 72-73 (listing his contacts with an EEO counselor in September through November 2005, his filing of an EEO charge on December 5, 2005, the investigation of his EEO charge from March to May 2006, his request on June 5, 2006, for a hearing with an EEO administrative judge, and his attorney's deposing of the Board's witnesses in February 2007).

Although not pleaded in the complaint, the foregoing listed events are documented in the voluminous administrative record upon which both parties have relied. Because the Court is obliged to consider the totality of a *pro se* litigant's filings, *Richardson v. U.S.*, 193 F.3d 545, 548-49 (D.C. Cir. 1999), it will deny without prejudice The Board's motion for dispositive relief on the retaliation claim and grant Mr. Hovsepyan's motion to appoint counsel who will then have the

18

opportunity to amend the complaint as to the surviving claim.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants the Board's motion to dismiss the Whistleblower Protection Act claim under Rule 12(b)(1), grants the Board's motion for summary judgment on the disability and age discrimination claims, and denies its motion on the retaliation claim.  As to the surviving retaliation claim, the Court grants Mr. Hovsepyan's motion to appoint counsel.  Finally, the Court denies Mr. Hovsepyan's motions for summary judgment.  A separate memorializing Order accompanies this Memorandum Opinion.


Date: March 18, 2011                                /s/
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge